May it please the Court, Joseph Tringali for Appellant Weyerhauser, reserving five minutes for rebuttal. The centerpiece of plaintiff's case below was issue preclusion, the grant of which was wrong as a matter of law under the exacting standards of this circuit. It wrongly benefited a classic wait-and-see plaintiff under the Supreme Court's holding in Parkway and Hosiery, and it resulted in judicial confusion rather than judicial efficiency, which is the goal of issue preclusion. Could I ask you to maybe take me through this a little bit with a couple of questions? I'm trying to figure out the significance of all this. In the case that went to the Court of Appeals, which has now been affirmed, I guess it was this spring, right? They found that there was, the relevant market there was the Pacific Northwest, right? What they did, Your Honor, actually they didn't make a finding on the Pacific Northwest. What they did is said Western Washington and Oregon is what they mention in terms of where Alder has grown. The jury? The jury, the jury's question was, and I'll read the jury's question, which was, had the plaintiffs established that there was a relevant market for alder saw lots in the Pacific Northwest? Right. That's the question the jury answered. And they said yes? And they said yes, correct. And the complaint, the complaint said that the Pacific Northwest was defined to include Oregon, Washington, and British Columbia. And there was evidence from at least one of the experts, William Blaney, that went into some detail about warehousers' market power in British Columbia. So... Your Honor, let me, first of all, Your Honor, I think the complaint does say that. But what I think is significant is, first of all, what the standard here is. Because I think the plaintiffs tried to argue a sufficiency of the evidence. Was there any evidence from which a jury could have included British Columbia? That's not the standard for issue preclusion in this circuit. The standard for issue preclusion in this circuit is, was such a finding free from doubt? Was there no other rational explanation? Was the issue identical? Was it necessarily determined? And if you look at the record, I don't think you can come to that conclusion. Counselor? Yes, Judge. I'm having trouble understanding the significance of the discussion. Here is, let me lay out my problem and then you educate me. The jury verdict in the old case says, have the plaintiffs established by a preponderance of evidence that there's a relevant market for alder saw logs in the Pacific Northwest? Yes. Has Plaintiff Ross Simmons Hardwood proven by a preponderance of the evidence his claim for monopolization? Yes. It doesn't say in the verdict form that British Columbia is in. It doesn't say it's out. It looks from the complaint in that case as though it was available for consideration. And certainly it was available to the parties to show that, for example, there's somebody as powerful in the market as Weyerhaeuser in B.C. And, and it seems to me like it would be your burden in this case, in opposing issue preclusion, to demonstrate that there's something about a change of circumstances in British Columbia that matters. Your Honor, first of all, it's plaintiff's burden in order to gain the benefit of issue preclusion. But let me point out to your Honor that... But on the face of it, they bore that burden. Well, Your Honor, that... Nothing in the jury verdict that would, that would suggest that the issues are not the same. But, but Your Honor, I, let me, let me read to you from some of the record that I think shows, should prove to this Court that, in fact, the issue was not necessarily determined, is not free from doubt, and there was another rational basis. That's not quite what's on my mind. What's on my mind is, why does it matter? Why does B.C. matter? It matters for this reason, Your Honor. Until September of 2000, and remember the relevant damages period in the prior case began in 1996. But until September of 2000, Weyerhaeuser did not buy, did not own the Coast Mountain facility, which is the largest altar facility in British Columbia. So had they included British Columbia for the period 1996 through 2000, they could not have relied on the 65 percent market share that is indisputably the market share for Oregon and Washington alone, because they would have had to add in the volume from British Columbia, which would have increased the numerator, but the, but the, the, I'm sorry, the denominator, but the numerator would remain the same. Counsel, it sounds to me like you just argued yourself out of, that you sort of argued opposite to your own interest, in a sense, because what you said is, well, we weren't in British Columbia during this period of time, so Pacific Northwest had to mean Oregon and Washington. But if that's true, you can't go back in time and change what was, and if you weren't in British Columbia, then you weren't in British Columbia. I just don't understand how that helps you. The, the, the, the issue is they gave a market share for the jury to rely on, a 65 percent market share. In which case? In Los Angeles. In Los Angeles. Okay. And it is undisputed that that market share was related to Western Oregon and Washington, not British Columbia. And my point is, if you include British Columbia in the market, you expand the market, but Weyerhaeuser has no share in British Columbia, you have now Weyerhaeuser. Right. And you can no longer argue that there's a 65 percent market share. Well, that was. It makes it worse. It makes it worse. No, it doesn't, Your Honor. You're saying that before 2000, you, there's, there's a facility that's the largest facility in BC that buys all their saw logs. Before 2000, you didn't own it. After 2000, you did. So it seems to me, once you own the biggest saw log buyer in BC, then whatever claim of monopolization there is, is chronic. But, Your Honor, you can't change the markets between the two periods, which is what they tried to do. In, in the Ross Simmons case, and, and let me direct you to the plaintiff's closing argument, where they go through the jury verdict, and they read the question about the Pacific Northwest to the jury, and they say, and this is on page 59 of the record, as to the first question, which is the Pacific, is the Pacific Northwest the relevant geographic market? They say, I, as to the first question, I think the evidence is absolutely overwhelming that there is a distinct product market for saw logs in Oregon and Washington. Then, when they read question three to the jury, which was the question Your Honor raised, Judge Graber read before about monopolization of Ross Simmons, they say, we will have proven, and this is on page 61 of the record, and I'll review the evidence more thoroughly that Weyerhaeuser has monopolized the alder industry in Oregon and Washington. So, when they go through the jury verdict form, with the jury, the plaintiffs, in this case, despite what they said in the complaint, Judge Graber, what they specifically say is Oregon and Washington. When they, when they talk about a 65 percent market share that they want the jury to rely on, they specifically refer to Oregon and Washington. When they have two experts testify, and Dr. Rasmussen, Mr. Rasmussen and Dr. Zerbe are their two industry experts, and both of those individuals testify. Zerbe is on 53. He's asked, so the geographic, he's asked, is there a geographic definition or component to what you describe as the alder saw log markets? His answer is, I believe I would describe it as western Washington and Oregon. Mr. Rasmussen has asked a similar question. He's asked on page 51 of the record, and does the alder saw log product market have a geography? Answer, it is confined to western Oregon and western Washington. Neither one of them was asked one way or the other about British Columbia, correct? But in their depositions. It's a yes or no question. They weren't asked. They were not asked about British Columbia. They were asked, what is the geographic market? They said western Oregon and western Washington. In their deposition, Dr. Zerbe, for example, is quite clear in his deposition in this case, which is on page 48 of the record, and continuing, 47 and 48 of the record, his deposition in this case, he testified that he only learned a few weeks before his deposition in this case, in the Washington alder case, that British Columbia was part of the market. He was not aware of that before. Even though Blaney so testified. Blaney was testifying as to British Columbia, Your Honor, in terms of what happened in British Columbia. He did not testify. He was never asked and never testified that British Columbia was part of the relevant geographic market for anti-drug purposes. The court in the present case described the precluded issues precisely in the terms of the verdict in Ross Simmons. In other words, for the years 1996 to 2001, there existed a relevant product market for alder saw loads, which is confined geographically to the Pacific Northwest, and that during those years, Weyerhaeuser possessed monopoly power, and so on and so forth. Those were the precise terms of the verdict. Why isn't that binding just by its own terms? Because the relevant question, legal question for this court, is whether or not there is any doubt, and whether the finding of Western Oregon and Oregon, Washington, British Columbia, was that done with clarity and certainty on this record, that there is no doubt and no other rational explanation. But there are no other facts. The facts are what the facts are. The players are the same. The laws are the same. Who owned what is the same? So isn't it just semantics? No, Your Honor. It's not semantics, because it has dramatic differences in terms of market share, and it has dramatic differences in terms of people's strategic interests. It was in the interest of Ross Simmons to have a market limited to Oregon and Washington, because from 1996 through 2000, they wanted to emphasize a market share of 65%, and you see that throughout the record. They couldn't emphasize a market share of 65% if they included the volume from British Columbia, which would have decreased Weyerhaeuser's market share. It sounds to me as though what your argument really amounts to is a challenge to the correctness of the judgment in the previous case. You're saying if they have included VC, then there couldn't have been a monopolization determination, because there wouldn't be enough of a percentage of the market. What I'm saying, Judge Graber, is that for purposes of issue preclusion, we look at the Washington, and they used Oregon and Washington, and for them to have used that for their own strategic reasons should not then allow another plaintiff to come along, who now is going to use the finding of a Pacific Northwest market and include British Columbia that had not been considered by the prior jury. Did the jury instructions in the previous case say whether VC was in or out? Absolutely not, Your Honor. So what you do have- I have an argument. I would think Weyerhaeuser would have argued in the previous case, look, the market doesn't stop at the border. The market is where the Alder logs are, and it includes VC, and we don't have 65% of that market. We have 38% or whatever it might have been. The argument was whether or not Alder Saw Logs themselves were a market, and there's a significant issue in terms of whether or not saw logs are exported, could have been exported at that period of time, because the prior owner, Coast and Mountain, that did not come up. The case about VC pre-2000, when Weyerhaeuser bought the biggest saw log buyer there, it would have been Weyerhaeuser that would have wanted to argue, but what about VC? VC is really important. It's a big part of the market, and we don't have- The argument, Your Honor, was with regard to Alder Saw Logs as to whether or not it was a relevant market, and the other argument was- I mean, you must have put on an expert who said, no, the relevant market includes VC and their market share. The relevant market, for our expert, had to do with whether or not Alder Saw Logs were a relevant market, as opposed to the geography. With regard to the geography, Your Honor, the testimony was fairly consistent, that there's a 100-mile trading radius, in fact, for a particular mill. And with regard to British Columbia, the issue is an issue of whether or not you can export, or whether you have blocking rights under Canadian law. But the issue that I really want, that I would appreciate the Court turning to, is that the issue below is not whether or not it said Pacific Northwest in the verdict form. We don't dispute that. If it said Pacific Northwest in the verdict form in Ross Simmons, it says Pacific Northwest in the verdict form in Washington Alder. The question is, is there any doubt in your mind, from this record, that there is another alternative for the geographic market being Oregon-Washington versus Oregon-Washington in British Columbia? Is the plaintiff here, in this new case, also in Washington and Oregon? Your Honor, that's significant because they are in Northwest Washington, essentially near the border between-  On the Washington side of the border. They're in Washington. They're in Northwest Washington, Your Honor, close to the Canadian border. If they were a BC, I gather you can't take the saw logs too far because they're too heavy and it costs- Absolutely, Your Honor. So they had an interest in- So I'm thinking if they were a BC mill, then you would have a good argument that they But, Your Honor, they're Northwest Washington and a major focus of their case was their effort- Sorry? It sounds to me as though Northwest Washington was included in the market definition that was used in the previous case, no matter how- That's absolutely correct, Your Honor, but the question is whether or not the British Columbia portion, which they include in the case, for their purposes of monopoly power- Radius includes BC? Yes, and they also put on a long story about how they attempted to buy this British Columbia facility and, in fact, Weyerhaeuser bought it instead. So for them, the British Columbia facility and its acquisition was a major part of their case. I also want to turn briefly- Can I back you up? Yes, Your Honor. Assuming that there's- your arguing is that the 65 percent share was of the Oregon- Washington. That's undisputed, Your Honor. Okay. So they add British Columbia later on, but what difference in the new case, the one before us, what difference does that ultimately make? It makes this difference, Your Honor, is that a finding of monopolization that this jury was told about for a market, it is a market that is limited to Oregon and Washington. Right. The jury in this case, though- that's in the Ross Simmons case. The jury in this case, though, is told that it's a market that includes Oregon, Washington, and British Columbia. But if- So they're getting an advantage of a monopolization finding for British Columbia that was never made by a jury in the Ross Simmons case. But if you're right, the jury should have been told that there was a relevant market for the older saw logs in Oregon and Washington, and there was a finding of monopolization by Weyerhaeuser in that market. And, Your Honor, that's exactly what the plaintiff asked the jury to find when he went to- But how does that change- my real question is, how does that change anything in this case? If that were done, what's the harm that resulted from your client? The harm, Your Honor, is that you cannot have a finding, for example, that a company monopolized a market in Illinois and then have another company sue with regard to California and use the verdict in Illinois. But- And the fact that there's- Where's the plaintiff's injury occur? Is there any evidence that the damage has occurred in British Columbia? Well, they argue that they would have- that they otherwise would have had that supply from British Columbia. And they argue that Weyerhaeuser denied them- denied- refused to- it blocked the exporting from that mill. More importantly, they argue that Weyerhaeuser thwarted their efforts to buy that mill instead of Weyerhaeuser. And that mill would have been an easy source for them of logs because- Did they calculate their damages based on that? They calculated their damages based on the increase to them of paying for logs, which would have included- obviously, if they could have had the logs from British Columbia, that obviously would not have been- those were logs that went to Weyerhaeuser. Is that part of the testimony? Yes, Your Honor. There clearly was testimony with regard to driving up log prices. There clearly was testimony- No, not that. The damages were attributable in part because they couldn't buy the plant. They said the damages were attributable to a whole host of actions, including the fact of the- what happened in British Columbia and the refusal to block- sorry, and the blocking of exports from British Columbia. So what you're really arguing is that there's a finding of damages that includes damages outside of the market that was found in the Ross-Stevens case. That's part of the argument, Your Honor. But the central part of the argument is that there was a finding, a monopolization in this case- in the prior case that was limited by the plaintiff's own closing, by the plaintiff's experts to Oregon and Washington. And that is not what Judge Panner found. Judge Panner found that the relevant market was British Columbia in both cases. Can we add something about whether that's possible? We've had a long-term trade dispute with Canada about timber. And I don't know the details of it. Can alder logs cross the border now? Could they during the relevant time for the previous jury verdict? Could they at the relevant time for the jury verdict in this case? When Coast Mountain- the testimony was that when Coast Mountain owned the facility, Your Honor, they blocked the exports. They had the right to block the exports and did so. It was Coast Mountain. I'm sorry. Coast Mountain is the company that Weyerhaeuser acquires in Delta, British Columbia, in September of 2000. With very little time remaining, I do want to just add one additional point with regard to the wait-and-see issue here. The Court should be aware that in June of 1999, Washington Alder sent an 11-page cease-and-desist letter to The Chairman and General Counsel of Weyerhaeuser at that time then became the lead trial lawyer for Ross Simmons in this case. And that's why Judge Banner decided that there was justification of waiting because he could be potentially a witness. Judge Moskowitz, let me add two things with regard to that. Number one, it was not a reason offered by the plaintiff. The plaintiff's only reason was they didn't know enough about the case, which was belied by the June 1999 findings. It's a lot healthier than class actions for resolving disputes where one defendant hurts a lot of plaintiffs. But, Your Honor, here what you have is manipulation where you have the Chairman and CEO. What's the harm? Well, the Supreme Court in Park Lane Hosiery, when they had to decide. It was okay. No, they said, Your Honor, that wait-and-see plaintiff was not okay and that the idea of bringing additional litigation as a benefit of offensive preclusion is actually the harm. And that's the harm they had to deal with when they decided to allow for offensive preclusion but not defensive. I'll review it. I don't remember them. I believe it's on 329 to 330 of the Park Lane Hosiery decision. Let me get back to that because Judge Banner, you're right, they didn't raise that. Judge Banner came up with that himself. But that happens every day in my courtroom that I come up with things that the parties didn't raise. I'm trying to think of it as a trial judge. If they both brought the cases at the same time, I would have said as a trial judge, well, the Russ Simmons case goes first. It's bigger. He's the lawyer in that case, and he could potentially be a witness in the other case. And so I'm going to sever. I'm not going to try them together. But, Your Honor, here what we had is no effort made by Washington other to bring a case. Instead, for them to sit back and to give the only reason they gave is that they didn't know enough about the case. When 18 months before Ross Simmons even brought a case, they had an 11-page memo written by a Seattle firm that they retained that they provided to Weyerhaeuser, and that's in the record. And the 11-page letter I submit to this Court, you should read it. It is exactly a blueprint for the complaint that was then used by- I don't think there's a dispute about that, but I focus. The question is abuse of discretion on behalf of Judge Panner. He decided that there were good reasons for them not to proceed. But, Your Honor, first of all, there were two reasons he gave. One was damages, and they were already with three plaintiffs in this case. And in many subsequent cases that have happened that are in the record, there were multiple plaintiffs. So the idea that there would be one additional multiple plaintiff would not have done anything with regard to the trial. With regard to the disqualification of counsel, there are other counsel available, and there is no case law that we have seen to suggest that someone can be the chairman, initiate a claim letter, remain an owner of the company at the time Ross Simmons' case is filed, have full knowledge of the case and full knowledge of the facts, and then be able to avail itself of not being a wait-and-see plaintiff because he elected to find plaintiffs that he found to be strategically better for him because they were out of business, and then brought Washington Alder along, which was a new entrant and a successful entrant, and make them come last in line. But that's what would have happened if they filed. The bigger case would have gone first. Well, Your Honor, first of all, they could have filed in June of 1999. They had the knowledge 18 months before, and I think the reasonable inference is that this was part of an orchestrated strategy, that there is no – this is the owner of Ross – sorry, of Washington Alder, who was chairman at the time, who was a stockholder at the time. If that's correct, why did they have three sawmill plaintiffs in the Ross Simmons case? Because they were the first two, Your Honor, in December of 2000 had gone out of business, and the third one joined after it went out of business. And I submit to Your Honor, and as a trial judge, Your Honor, must be aware of this, but I would assume that for a jury, it is more sympathetic to have three companies that are out of business than it is to have a financially healthy new entrant. Thank you, counsel. Thank you. Counsel, please proceed. Thank you, Your Honor. May it please the Court and counsel, my name is Roy Pulvers. I'm representing the appellee Washington Alder LLC in this matter, and at counsel table is Albert Bannon, trial counsel. I would like, if I may, to go through the effects of the Ross Simmons decision on the adjudication of this case. Could you help me with a little detail? I asked your adversary, and he didn't want to spend a lot of time on it. Could logs cross the border from B.C. at the time period covered by the previous verdict, and could Alder logs cross the border from B.C. at the time period covered by your verdict? My understanding of the record is that the answer to that is yes, that the company in Washington has some control over whether or not that may happen, whether to block or not. But my understanding is that the logs can and do cross the border. Getting back to what we spent a good deal of time about a few minutes ago, the issue of preclusion on the market. Was the market in Ross Simmons the Oregon-Washington market? The market in Ross Simmons was the Pacific Northwest. What was the evidence that they found that? Well, there was substantial evidence to that effect. Actually, let me ask you once, rather than go through all the evidence that we probably agree on. What about the evidence that there was a market for saw logs as part of the Pacific Northwest in B.C.? Well, there's substantial evidence to support that, beginning with the exhibit that I provided to court and counsel, which is at SCR 514, which was a demonstrative exhibit of Weyerhaeuser itself in Ross Simmons and an admitted exhibit in Washington Alder. And it's quite apparent from that exhibit that the Delta B.C. mill, which is Coast, which is the mill that we're talking about, plainly, by any definition of the market, fits within the definition. Certainly, if Eugene, Oregon fits within the definition, Delta B.C. fits within the definition. It's clustered just in the same way that the three Oregon-Washington mills are clustered around the border. Likewise, the Oregon-Washington B.C. mills are in the same trading radius, same cluster. In addition, there were stipulated facts, stipulated facts the jury was instructed to consider as true, and those facts include- Which number? I have the stipulation right here. Okay, thank you. I'll give them to you in one second. I know you raised them in your brief. Paragraph 31 of the stipulated facts, the Northwest hardwood sawmills in the Pacific Northwest are located in Delta, B.C., etc. SCR 514, which we've mentioned. At paragraph 4, it talks about their hardwood mills in Oregon, Washington, B.C. Paragraph 13, it talks about Weyerhaeuser's processing of alder logs took place only in the Pacific Northwest. Paragraph 36 refers to and describes the acquisition of Coast in British Columbia. Importantly, paragraph 42 of the stipulated facts, which can be found at SCR 8, says it has an annual lumber production chart for Weyerhaeuser's hardwood sawmills in the Pacific Northwest by 1,000 board feet, and that includes the Delta mill, which is the British Columbia mill. That's only in 2001? That's correct. The purchase, 2000, and it geared up significantly in 2001. I think the purchase was 9-2000, September 2000. What was the market time that they found in your case? In this case, the market is, if I'm correct, 1999 through 2002. So it would have included the 2001 production from the Delta plant? That's correct. Also, we have Mr. Blaney's testimony where he goes at length to describe the acquisition of McMillan Bloedel and Coast by Weyerhaeuser in British Columbia, none of which was objected to. I have a question about the relevance and application of the stipulation in the Ross Sims case. There is a really quite old Ninth Circuit case that says for purposes of issue preclusion, a matter that was stipulated to has not been litigated. Are there any more recent cases that have a different rule, or if not, how does that rule affect your argument that there was a stipulation? I don't believe it affects the argument at all, Judge Graber. My response to Judge Moskowitz and what we argued in our briefs is that there was evidence in the record from which the jury could conclude that the market was in the Pacific Northwest, which was the answer that it gave to the jury instruction. Yes, except that's a slightly different tape because for issue preclusion to apply, the matter has to have been necessarily litigated and answered. And technically, the jury's verdict that there was a relevant market in the Pacific Northwest could be a true verdict whether it included British Columbia or not. So if there's evidence both ways, why don't you do it? The issue for issue preclusion is whether the jury necessarily found a market in the Pacific Northwest. That's all that Judge Panner gave issue preclusion to. There was no obligation on the jury, no legal obligation to define the precise parameters of the market, nor was there any request by Weyerhaeuser that the instruction or the verdict form or the pleadings or any of that. The issue on issue preclusion is was it actually adjudicated, and that means was it raised, which it was in the pleadings manifestly. Was it submitted clearly in the jury instructions where the jury was instructed that Washington Alder had alleged a relevant market in the Pacific Northwest. The jury was instructed how to define a market, how to put a market together. The jury was then asked was there a market for alder saw logs in the Pacific Northwest, and they responded to that yes. And Judge Panner simply, straightforwardly, without elaboration, gave precise effect to the express special interrogatory that had been answered in the affirmative by the jury. Now, in the Ross-Simmons case, this depends very much on the trial judge, were the pleadings either given to the jury or read to the jury or summarized for the jury in Ross-Simmons? In other words, did they know that the allegation was in Ross-Simmons that the relevant marketing, that the Pacific Northwest meant British Columbia? No, the jury was instructed that the pleadings alleged that the relevant market was the Pacific Northwest. Without elaboration. Correct. What evidence on that stipulation issue? I'm trying to think through what Judge Graber raised. I'm thinking if you had two damages cases arising out of a car accident, and then one of them the defense attorney said we stipulate that the defendant was drunk, we stipulate that he ran the red light, we stipulate that he hit the car that the plaintiff was in, all that we're disputing in this case is whether the damages to the plaintiff were approximately caused by the accident. We think it's all pre-existing conditions. Second case, the defendant says we do not stipulate that the defendant was drunk and ran the red light. We think that it was green and he was sober, and that's what we'll prove to you. Issue preclusion on whether he was drunk and ran the red light? The germane inquiry is whether the court concludes that the jury necessarily made a decision. That is, that a matter was actually adjudicated, and in the first instance the jury is instructed that the defendant has admitted liability. That's not an active point for adjudication. In the instance that we're describing in this case, the jury came to a special interrogatory verdict that said, yes, there is a relevant market in the Pacific Northwest, and underneath that as support for that, including Weyerhaeuser's own exhibit and facts to which Weyerhaeuser stipulated, the issue is not, as counsel phrased it, could the jury have found British Columbia in the market? The issue is did the jury find the Pacific Northwest? That was the issue. That's the issue that was given preclusive effect. Let me make sure I understand this. The jury necessarily did adjudicate whatever was put before them on the relevant market, because the relevant question in the previous case was not, is B.C. in or out of the market? The relevant question was, is there a market, and is that market monopolized by Weyerhaeuser? Is there a relevant product market? Is there a relevant geographic market defined as the Pacific Northwest? And then was there anti-competitive conduct? To revise Judge Kleinfeld's hypothetical, it would be more like in the first case you stipulated that the person drank bourbon, and then you come around and say we really drank beer, but it was the jury that found that the person was drunk, so it doesn't really matter whether it was him or the beer. That's what's underlying the rule that you described. One thing that I would ask the Court's permission to touch on that is not fully developed in the briefing, but that arises as a result of the Ross-Simmons decision, is that the Ross-Simmons decision, two points. One is that it obviates this Court's consideration of both the substantial foreclosure and acquisition issues. The second is that it suggests a harmless error argument with respect to their final argument, which related to barriers to entry that I want to touch on briefly. The Court makes clear in its holdings with respect to barriers to entry that it states the following. The evidence does not show that the four new entrants could take enough business away from Weyerhaeuser to allow the market to correct itself. That's at page 1044 of the decision. That ability of the market to correct itself, of course, is the core of an entry barriers analysis. So what the Ninth Circus decision in that case is suggesting is that the evidence that they're complaining about on barriers to entry here is de minimis. What makes that further develop into a harmless error argument is the following. First of all, there is not, that I am aware of, any offer of proof cited by Weyerhaeuser as to the specifics with respect to new entrants. And more important, the evidence of the new entrants came in in the Washington Alder case anyway. The four new entrants were Washington Alder itself, about which there was enormous evidence, obviously. Westwood, about whom there was substantial testimony, and I can cite the court to page and verse with respect to Westwood. And since this is not brief, if I may, I'll just recite quickly the volume and pages. Volume 2B, page 51 and 54. Volume 3A, page 22. Volume 3B, page 88. Volume 4B, pages- You're going to have to get all those to pass for me. I apologize. Where shall I back up to? 2B. Okay. 2B, page 51. 2B, page 54. 3A, page 22. 3B, page 88. 4B, page 38. 4B, page 45. 4B, page 131. 6B, page 135. And 7A, page 72. All of that related to Westwood. And as to Westwood, there was evidence of its date of entry, its ability to enter the market, and the capacity of its mill. All of that came in, which is to say that the judge, if objections were not made, he didn't catch every time that there might have conceivably been an objection. And therefore, as to the new entrants, you had Washington Oil, you had Westwood, about which there was substantial testimony. Diamond Lumber was the third. Westwood, they came in in June 2002. Therefore, there was evidence admissible and admitted about them because that was outside the preclusion period. It was beyond 2001. And the references there are volume 2B, page 63, and volume 3B, page 88. And finally, there was one very minor other entrant, Willapa Bay, for which there is a passing reference at, I believe it's 3B, 131. But I'm not positive on the, I can give it to you in a second. It is page 131, and I apologize, I don't have the volume. It's in Mr. Thompson's testimony, Dell Thompson's testimony. Point being, there were four of the nine independents who had less than 35% of the market among them. The Ninth Circuit's decision says that the evidence suggested that warehousers' market share increased during the time period that these businesses entered. And, in fact, the evidence definitely does suggest that, and it most emphatically was the case when they acquired Coast. So I did want to bring that out because that was not fully developed in the briefing and is triggered by what the Ninth Circuit's decision says, but also the fact that there is evidence as to the new entrants that did come in. At the end of the day, this appeal challenges issue preclusion issues and conduct of Judge Panner in issuing a curative instruction that falls squarely within the ambit of a trial judge's authority to control the litigation before the court. As to issue preclusion, Judge Panner was intimately involved in both Ross Simmons and Washington Alder, and he gave effect to the jury's express findings and the undisputed law with respect to issue preclusion. Tell me if I have the law right on what you're seeking. As I understand the state of the law under Parkland, there is no bar on wait-and-see litigation strategy, running a good plaintiff by the jury first, and if you win, using issue preclusion for the other plaintiffs. But the trial judge has discretion in cases where it's unfair for some reason to say, no, you have to prove it again. It might be unfair if, for example, the first case was so small that it didn't make any sense to put a lot of resources into it. There could be various circumstances, I guess. That's precisely correct. That's the current state of the law. That's correct, and indeed the Starker case out of the Ninth Circuit says that the court will not assume that a plaintiff is a wait-and-see plaintiff so long as there is any legitimate tactical or practical reason for the case to have been brought separately. Can I get back to our original issue? Was there any evidence in the Ross Simmons case going to damages about not being able to get saw logs in British Columbia? That's a fair question. I'm going to have to reach back in my mind about that. My recollection is in Ross Simmons that the testimony with respect to Coast was that Weyerhaeuser was going to be able to use Coast as a low-cost sourcing supply, including its Oregon mills. That was the testimony that I recall from Ross Simmons with respect to that. If the relevant market is Oregon and Washington, how then does it make a difference that there is some evidence about British Columbia? Their argument is, well, change is the denominator. I think even if you do the math, frankly, that won't hold water either. Certainly after they acquire Coast, it goes up. Before they acquire Coast, if you do the math, Coast was maybe an eighth approximately, if you look at the stipulated facts with respect to production in 2001, for example. It's maybe about an eighth of the total. Weyerhaeuser clearly had some piece of that as a buyer in the market. Even if you attributed almost nothing to Weyerhaeuser, you'd still be in a position where even if you increased the denominator, you still were in an area where there's market share. I think that that's the response with respect to that. Do you want to address directly their argument as to how the market share difference between adding British Columbia would affect the result in your case here? I don't think it does. I come out in the same place that Judge Panard did on that, which is he, like Judge Kleinfeld, kind of scratched his head and couldn't figure out why it really mattered at the end of the day, that the jury had adequate instructions, more than adequate instructions, not challenged about how to define a market. Exhibits like the exhibit that I provided to the court, which was Weyerhaeuser's own exhibit, made it quite clear that the Delta Mill, by any definition, would have been part of the market. With respect to market share, again, post-2000, September 2000, it's clear that that purchase increased Weyerhaeuser's share. Before that, even if you increased the denominator, it doesn't take it out of a monopoly or attempted monopoly scenario. They're still firmly squarely in the percentages. Are you saying that even before Weyerhaeuser purchased the British Columbia Mill, and even if you count British Columbia as part of the market, Weyerhaeuser's percentage of the market would still be in close to 65 percent? I'm saying that it would still be, and I'd have to redo the math. I did do it at one point, and I think it's certainly 50 and above is my recollection. It's easy enough to do. Even if you attribute zero of those saw logs purchased by Weyerhaeuser, you're still in an attempted monopoly market share situation, and clearly zero is not the right number. Do any of your damages in this case come from the inability to compete or the antitrust damage from British Columbia? Well, there was testimony in this case that Weyerhaeuser believed that when it purchased Coast, one of the ancillary benefits of that would be that it would push Washington and Alder out of business. So clearly, Weyerhaeuser's acquisition of Coast made a difference with respect to Washington and Alder's ability to access logs, which is access logs, period, because they then became fully controlled by Weyerhaeuser and to access them at a fair price. Was there evidence in the Ross Simmons case about getting logs from British Columbia? I don't recall the answer to that specifically. I think that the answer that I gave earlier is the best I can do at this moment on that point. We do have in this record in the SER our brief in the Ross Simmons case, and you can refer to that if you need to do so. Thank you, counsel. Thank you very much, Your Honor. Counsel, although you ran through all of your time and have none left, take one minute anyway before you call. First, let me just cite Park Lane at 331, where the court says the general rule should be that in cases where a plaintiff could easily have joined in the earlier action, and goes on to give other examples, a trial judge should not allow the use of offensive collateral estoppel. The second point I want to point out is we're talking about two very different standards here. One is, was there any evidence from which a jury could have included British Columbia versus whether it was clear, certain, no doubt, no other reasonable explanation. And I think it is simply not possible as a matter of law for this court to conclude that the jury necessarily determined that British Columbia was part of the Pacific Northwest market when plaintiff's counsel states when he goes through the jury form and specifically mentions Pacific Northwest, that he's talking about Oregon and Washington, when his two experts say Oregon and Washington, and when none of the evidence, none of the evidence with regard to British Columbia is given in the context of whether it is included or not in the market definition. Even the stipulation that they give you, even the location of the mills, none of that is in the context of market definition and whether or not these mills are in competition with one another. That is what this court needs to have before it, and that's what it doesn't have. The final point is with regard to the recoupment issue, Mr. Pulvers gave you various examples where the court allowed evidence. I would cite you to footnote 33 in our brief, which lists various examples where we try to put in evidence on recoupment and the court denied it. I'd also point out that there's a difference between entry barriers and recoupment. Entry barriers has to deal with whether someone will enter the market where the market is alleged to be monopolized and anti-competitive. Recoupment deals with when the market is no longer in a predatory phase because the alleged monopolist is now paying a lower price for logs, whether people would have an incentive to enter the market. One question. Say Judge Panner charged in this case, the jury, that it had been determined that there was a relevant market for all their soil logs in Oregon and Washington. How would this case come out differently? It would come out differently, Your Honor, because first of all, you wouldn't have issued preclusion. That's the first and fundamental reason. The jury had issued preclusion in this case only based on the fact that Judge Panner decided that the prior jury had determined the relevant market included British Columbia, which he had to find was done with clarity and certainty. But he didn't instruct the jury that British Columbia is within the market. He just called it the Pacific Northwest. He did, Your Honor, but he gave them issue preclusion for all the period from 1999 through 2001. He gave them issue preclusion based on a relevant market of Oregon, Washington, and British Columbia having been necessarily determined. What did he tell the jury in, and he also gave it to them to have in their notebooks? Did he use British Columbia? No, he used Pacific Northwest, Your Honor, but my point is that that issue preclusion instruction would never have been given to the jury but for his finding that British Columbia was necessarily determined in the prior action. Why is that? Because he would have been unable to as a matter of law under Ninth Circuit precedent. Under Ninth Circuit precedent, unless this Court concludes that it's clear, certain, free from doubt, no other rational explanation that Pacific Northwest included British Columbia, he cannot grant issue preclusion. That's the circuit court law. As an implicit presupposition, and that is that it mattered whether British Columbia was included or excluded from the market, and I can't see where that's established. But, Your Honor, first of all, it's... What I'm looking at is if, in the previous case, B.C. was excluded and the issue in the new case was whether to include B.C. because that would change the outcome, not just change the outcome in terms of which side gets a procedural advantage from issue preclusion, but change the outcome on whether Weyerhaeuser is monopolizing the market. But, Your Honor, it may change the outcome. It may change the outcome because we don't know what the market share would have been. Mr. Pulver says it could be 50 percent. 50 percent and 65 percent can sound very different to a jury. And just because 50 percent is exactly on the low end, and there are cases that find that monopolization you cannot find with a 50 percent share, that you need at least a 60 percent share, so it does make a difference. And where you have a case where you do not have... But, Your Honor, the problem is... I read the briefs, and the question of whether B.C. was included in or excluded from the market that the plaintiffs and defendant were competing in simply does not seem to have been a disputed issue of any importance in the previous case. And when I read the briefs for this case, nobody shows me that it would have mattered if it was a disputed issue and the outcome was resolved one way, you'd get this outcome. If it was resolved the other way, you'd get that outcome, and the outcomes would differ in the cases. Your Honor, I submit to you in the first case, Western Washington and Western Oregon was what the plaintiffs said was the relevant market and was not contested by Weyerhaeuser in terms of geography. And I submit to you in this case the reason why it makes a difference is because you have an issue preclusion instruction which carries with it prejudicial weight by finding a monopolization based on a market that this plaintiff contends is not the market. As far as I can tell, in both cases we've had a considerable amount of vagueness and loose talk about whether the market was Washington and Oregon or Western Washington and Oregon. The reason for the vagueness and loose talk is probably that you don't find all their blogs in Eastern Washington and Eastern Oregon, so nobody cares. It didn't matter. But, Your Honor, for purposes of measuring the market share, it does matter. And where they repeatedly rely on a 65 percent market share and have their expert opine that Dr. Zerbe opines that a 65 percent market share is what he uses to base the fact that Weyerhaeuser had monopoly power. If that wasn't available to him, how can we say that a jury would have found that there was monopoly power? If that's the basis for the expert's testimony. I still have a problem with one thing, and I probably think that my colleagues probably have the same problem. I'm not sure that you're getting to it. Assume for the moment that Judge Panner said in this case the market is Washington and Oregon. Assume that. Then he said because of preclusion. How does this case come out any differently? It comes out differently, Your Honor, because then the plaintiff has to deal with excluding. They would have had to try a different case with regard to the period where they were going to include. They would have to deal with British Columbia. And there would then be an argument over whether or not to include or exclude British Columbia and what that share would have been and whether they had damages or not had damages. For them it was very important to include British Columbia because they had it in that, because of Weyerhaeuser's acquisition in the period of time that was relevant to them for the non-precluded period for 2000. But the jury didn't find that. The jury found the same period as Ross Simmons, right? The jury was precluded in one period, and the jury actually had a split verdict. In the precluded period it found against Weyerhaeuser. For the non-precluded period it found in favor of Weyerhaeuser. So for the precluded period, how is Weyerhaeuser harmed? It's harmed, Your Honor, for the simple fact that someone is entitled to, is given entitlement to issue preclusion where he does not meet this circuit's standard for issue preclusion. Except that there's always the opportunity to amend one's pleadings, right? I mean, the district court can deny leave. But let's say that Judge Panner had held, well, okay, I think in the first case, at least up until the time of the acquisition of this British Columbia mill, it's only Oregon and Washington. Plaintiff comes in and says, fine by us, we'll call it Pacific Northwest Oregon and Washington up until 2000, and he'd still be precluded. For that period of time, if they had done that, Your Honor, then they would have had to deal with the issue of how they deal with having British Columbia in the market for one period of time and not in another period of time. What they tried to do is to reconcile. The first plaintiff decided they were best off leaving British Columbia out of the market. They had a higher market share. It's certainly not what their complaint said. That's what their counsel said. But it is certainly theoretically possible to have a market geographically or otherwise alter over time. That is, the market for widgets in 1990 might be a different market than it is in 2005. And so they could easily have still said, fine, whatever you want to call the market, however you wanted to define it. We're happy with the definition because we have a jury verdict in our favor. We'll define it that way, and then for the non-precluded period, we're going to show you acquired a mill in British Columbia, the market included British Columbia. Great. It just seems like I don't understand how it helps you. Well, Your Honor, it helps because, well, first of all, Your Honor, that's something they could have done, and if they had tried to do something like that, then Weyerhaeuser would have had the opportunity to cross-examine them and expose the fact that they were changing the market and whether there was a basis for them to change the geographical market. That's number one. But number two, Your Honor, the fundamental issue here is whether or not the grant of issue preclusion was proper, both under the Ninth Circuit standards with regard to whether or not there was an identity of issue with regard to the geographic market. And just saying Pacific Northwest, Your Honor, is not enough. Judge Kleinfeld, you mentioned... Your own exhibit. I assume you agreed this was one of your own exhibits. Yes, Your Honor, and the point I made on that exhibit is saying Pacific Northwest in terms of this is where we have mills in the Pacific Northwest, and saying that this is the market, the geographic market for antitrust purposes. The testimony that deals with market definition... Would you try that distinction for the jury in the earlier case? No, Your Honor, but the plaintiff did. When the plaintiff went through the jury verdict form with the jury, which was the only information the jury had with regard to Pacific Northwest, where the plaintiff used the term, and Judge Kleinfeld pointed out that it's murky and that there are these ambiguous references, and he's absolutely correct, but under the Ninth Circuit standard, that's a basis for denying issue preclusion. I'm not disputing, Judge Kleinfeld, that there are references to British Columbia, but what I am disputing is that those references are clear and certain that it was included in the relevant market definition for Pacific Northwest. I don't see how you can reconcile the plaintiff's closing argument, the testimony of its two expert witnesses, the market share that it uses and relies on with the fact that British Columbia is not being included in the market. Is that so clear? As I understand it, the expert said that the market is 100 mile radius around the song. Basically, these logs are heavy. And it looks to me as though probably one or two of these northern Washington mills would have been less than 100 miles from the border. Your Honor, both of those experts, Rasmussen and Zerbe, when asked the question as to the geographic market, answered explicitly Washington and Oregon in the first case. And they both stated that they did not include, in their depositions in this case, that they did not include British Columbia. One said it was because his answer was incomplete. The other one said it was because he didn't realize until a few weeks before his testimony in this case, the second case, that it was possible to include logs from British Columbia that they could be exported into the United States. I want to get back to one thing, because every time I ask you about this, you come back with an answer which I respect, that you say, look, the error was applying issue preclusion. But there's something short of that that I don't think you're really addressing. And that is this, that there may have very well been proper issue preclusion here, but the definition of what was precluded really wasn't clear. It seems to me that there's, even taking everything you've said, that the issue preclusion perhaps from your argument should have been Washington and Oregon. And so if they were told that to the jury, that look, there's a relevant market that they monopolized in Washington and Oregon for the older logs, then I'm not sure you'd have an argument here, and this is what I want you to address, because you won on the second half, which would have involved British Columbia. But you didn't own the mill until late 2000 in British Columbia. And so I'm not sure why this makes a difference. Even though perhaps you're right that there was an error, I'm not sure that the error was prejudicial. And that's what I've been trying to grasp. Your Honor, first of all, I'm not sure that there is a harmless error standard for issue preclusion. Secondly, Your Honor, the fundamental issue is that if they had said Western Washington and Oregon was their relevant geographic market, that would have been a definition presumably that they would have taken throughout the time period, which they didn't. They said British Columbia. So now we have a situation, if they had said British Columbia in the earlier time period, which is what they contend they did say, then you can no longer have the 65 percent market share. You might have a 50 percent market share. But then what you're trying to do is undermine the previous verdict, which is what Ms. Feinfeld asked you about before, because if, and this is a big if, but let's assume we disagree with you about the earlier market definition. Let's say that we find that it was including British Columbia in the Ross-Simmons case. Then the fact that in your view there wasn't a big enough percentage to create a monopoly is kind of a so what at this point, because you could appeal that in the Ross-Simmons case, but not here. So doesn't it all rise or fall, I mean, under your argument, doesn't it all have to rise or fall on what the definition of Pacific Northwest was in the earlier case? It does, Your Honor. So if the definitions are identical then and now, if we were to conclude that, and I know you don't concede it, but if we were to conclude that, then issue preclusion applies, even if you think that the jury couldn't have properly found monopoly. Your Honor, my argument goes to the fact that the Pacific Northwest was at best uncertain in terms of how it was defined, and I think the stronger argument, it was defined to be Oregon and Washington. That is my argument with regard to that piece. There's also the additional argument with regard to wait and see. With regard to that argument, Your Honor, that is... It rises or falls on the definition. It rises or falls on the definition because it has to be an identity of issue that's clear, certain, no doubt, no other rational basis, and I submit that that cannot be done. I'm not attacking the verdict in Ross-Simmons in any way. Is there any damage during the preclusion period that resulted from British Columbia? Any evidence of damage that the plaintiffs obtained from British Columbia? To the extent, Your Honor, that they claim... What they claim essentially is log prices were higher than they otherwise would have been, and they attribute it to all factors. One of the factors that they mention in terms of the anti-competitive acts of Weyerhaeuser was the acquisition of the Coast Mountain Mill in British Columbia, and as you heard Mr. Pulver say, there's an argument that that would... That's during the preclusion period? Yes, because there's an overlap from 2000 through 2001, so it's essentially a two-year... Was that also argued for damages in the Ross-Simmons case? In Ross-Simmons, it was a damage... Well, one of the experts was the same. Many of the witnesses in the two cases were identical witnesses, and one damages expert, Mr. Rasmussen, was identical in both cases, and he used the same damages theory in both cases, Your Honor. So it's still related to the exact same facts? Yes, except that with regard to a different time period, and without the acquisition of Ross-Simmons... Sorry, the acquisition of Coast Mountain that Washington Alder argued would have provided them with a cheaper source of logs. The acquisition of Coast was not in evidence in the Ross-Simmons case? It was in evidence, Your Honor, but there wasn't the argument, obviously, that Washington Alder would have had that as a cheaper source of logs available to them, because the whole damages theory, or one of the damages theories, was a driving up of log prices. In other words, that they had to pay a higher price for logs than they otherwise would have. And Coast Mountain acquisition was one of that. How could it come into evidence if they weren't talking about B.C. being part of the market? They were talking about B.C. being part of the market, Your Honor, in Washington Alder. He's talking about Ross-Simmons. In Ross-Simmons, any anti-competitive action of Weyerhaeuser was admitted into evidence. There was no objection made that I can recall with regard to that issue, that it wasn't British Columbia, but there were a host of other actions of Weyerhaeuser, some that were within or some without the time period. So it wasn't within the definition. It wasn't a question of whether or not it was in definition of the relevant market. They introduced, in the previous case, evidence of monopolistic conduct in British Columbia. There was no objection to it. They introduced the fact that Coast Mountain was acquired by Weyerhaeuser. The purpose was to show that that was conduct intended to monopolize. Never in the context of monopolizing a market that included British Columbia, Your Honor. But why did they try to show? Basically, their argument, what they tried to show was anything that they considered to be a bad act, whether it was a threat to a competitor, whatever it was, to put as much of that before the jury. Was it a bad act other than trying to monopolize the British Columbia market? It was a bad act in the sense that it was depriving someone else of logs and giving Weyerhaeuser additional logs, but whether those logs were logs that otherwise would have been part of the same market in which Ross Simmons competed in or a different market, that's the issue that was open. Because the issue that they were claiming was that they were in a Washington-Oregon market, and that has to do with the testimony Your Honor was also referring to, this hundred-mile radius. Thank you. Well, we went way over time on everybody because we just got so interested in your very fine argument. Thank you very much. Washington, all those in favor of Weyerhaeuser, please submit.
judges: Kleinfeld, Graber, Moskowitz